United States District Court
Southern District of Texas
**ENTERED**
April 17, 2018
David J. Bradley, Clerk

| | | |
|---|---|---|
| Randall Turnage, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| versus | § | Civil Action H-14-2481 |
| | § | |
| Harris County, et al., | § | |
| | § | |
| Defendants. | § | |

## Opinion on Dispositive Motions

1. *Background.*

Randall Turnage was a part-time, reserve deputy constable for Harris County Precinct 6 – a volunteer. A part-time constable cannot pursue other jobs that require him to act in his capacity as a law enforcement official or that require a security license. The precinct policy was that the constables could not take an unapproved side job.

On April 12, 2013, Bill Kessler – another reserve deputy constable – asked him for a personal favor. Kessler said that his son knew of a company that needed a civilian to watch a piece of equipment at the Port of Galveston because the scheduled transport truck was delayed. The company needed someone to ensure that it would not be damaged by vandals. Turnage says that the company told Kessler that it had received approval from the Port of Galveston Police Department to have a civilian watch the equipment. He would wear plain clothes, only observe, and not be paid.

A. *The Incident.*

The equipment was unloaded in an unmarked, gravel public parking lot outside the restricted access gates of the port. For three nights the off-duty

officers watched the equipment. The first two nights were without incident. Around midnight on the third night, April 17, 2013, Turnage relieved Kessler from his shift. During his watch, Turnage drove away for a break. After he returned, Felipe Herrera of the Port of Galveston approached him. The Board of Trustees of the Wharves oversees the Port of Galveston Police Department.

Herrera asked Turnage why he was lingering in the parking lot. Turnage told him that he was there to watch the equipment and revealed that he was armed. He was belligerent when Herrera asked for identification. Turnage says that Herrera took his badge from his hands so aggressively that he fell into his vehicle, getting a bloody nose. Hererra says that Turnage shoved a worn badge in his face and then pulled it away when Hererra tried to take a closer look. Herrera called for backup and two other port officers – John Parker and David Thomas – arrived. After arguing with the officers, Turnage showed a temporary driver's license.

Turnage finally said that he was a "deputy constable" for Precinct 6. He did not mention that he was in the reserves and would not show departmental identification because he said that he was working an extra job and did not have it. Parker then told Turnage to leave. He refused, so Parker said he would have to arrest Turnage if he did not leave. Turnage left. He claims that Thomas was outraged that officers from Harris County were taking extra jobs away from Galveston officers.

B. *Port of Galveston.*

At 1:45 a.m., Parker told a Precinct 6 dispatcher about the incident. The dispatcher then told a constable. At 4:45 a.m., Parker told Herrera to classify the incident as "responding to a suspicious vehicle." The next day, Robert Pierce, the Port of Galveston chief of police, said that he discussed the case with Harris County Constable Victor Trevino and would let him handle Turnage internally.

Over the next month, the three port officers submitted affidavits describing the incident to Carlos DeAlejandro, a Harris County lieutenant constable. On May 22, 2013, Turnage was ordered to prepare a written response to the port's official police reports.

Turnage claims that a week later a Galveston officer, whom he did not identify, was overheard bragging to his friends that he has driven out a Harris County constable to teach them to stay off the island. He assigns many bad-faith motives to the port officers, saying that the reports were designed to cover up Galveston officers' intimidating, harassing, and shaking-down officers from other jurisdictions to prevent them from taking jobs on Galveston Island. These accusations are not precise, and he offers no evidence that this actually happened. He also neglects to mention his own wrongdoing.

C. Harris County Precinct 6.

On April 17, Guzman called Turnage and ordered him to write an incident report. That afternoon, he attended a meeting with DeAlejandro and Lillian Lozano. Turnage says that Lozano was not his supervisor; rather, she supervised contracts and served as the administrative lieutenant for office staff. Turnage says that Lozano shredded his original report because it was unacceptable and ordered him to write another. Without support for his accusation, he says that Lozano commonly destroys official state documents in order to consolidate power, hide information, and manufacture evidence.

Instead of doing as instructed, Turnage printed a copy of the same report and addressed it directly to Trevino, the constable.

DeAlejandro wrote to tell him that he was suspended because he was under investigation. Kessler – the other constable watching the equipment – was also suspended for taking an unapproved extra job. On May 22, DeAlejandro confirmed to Turnage that he was still suspended. Assistant County Attorney Cheryl Elliott Thornton supervised the investigation.

The Harris County officers reviewed the investigation. Lozano and DeAlejandro recommended dismissal. A lieutenant recommended suspension and sensitivity courses. Another lieutenant recommended that he receive a written reprimand.

Turnage's personnel file includes a typed memorandum in Jarrel Caldwell's name. It recommends Turnage's dismissal. Caldwell denies writing it and says that once, in a meeting, he said that Turnage and Kessler should get

the same punishment. Turnage alleges that Lozano and DeAlejandro manufactured documents and manipulated evidence so they could dismiss him.

On July 23, Turnage was removed from Precinct 6 because of his belligerent behavior at the port. DeAlejandro and Lozano signed the removal letter, but Turnage refused to sign it and was escorted from the building. He received a "general discharge" on his record. That day, Kessler was reinstated as a reserve-duty constable.

### C.     Harris County Attorney.

On October 7, 2013, Turnage requested a copy of his personnel file, including internal affairs investigations. Turnage says the county attorney and Precinct 6 had fifteen days to respond to the request. The Texas attorney general told them to release all information unless it was confidential. They released no information, claiming that the file was entirely confidential. On December 19, Turnage requested the information again. On January 14, 2014, Assistant County Attorney Thornton asked the attorney general to determine whether the information was confidential and could be withheld. On February 6, Turnage requested his personnel file a third time. On February 12, Precinct 6 released part of his file. Turnage says it was incomplete. On March 17, the attorney general ordered Precinct 6 to release all information in his file that it had not already been given permission to withhold.

### D.     Trevino's Campaign.

Turnage thinks that he was dismissed because he did not contribute to Trevino's reelection campaign in 2012. He says that DeAlejandro and Lozano pushed reserve deputies to donate. In a meeting in July 2012, Lozano said that every deputy had to take fundraising tickets, and DeAlejandro said that those who did not return the value of the tickets were "not part of the team." Who took which tickets was recorded. Turnage took tickets but did not donate. He has offered no data on who else did or did not donate.

2.  *Precinct 6.*

Harris County Constable Precinct 6 is a department of Harris County. It does not have the legal capacity to sue or be sued. It will be dismissed.

3.  *Harris County.*

   A.  *First Amendment.*

Turnage claims that he was fired because he did not give money to Trevino's reelection campaign. He has not shown how his dismissal might have been connected to the campaign. He simply says that he thought that Trevino, DeAlejandro, and Lozano were "harrassing" him after realizing that he was not going to contribute. He has given the court no data on other non-donors, including whether they existed and what happened to them. Turnage did not contribute after a fundraiser in July of 2012. He was dismissed in July of 2013 – a year later. In between were the incident at the Port of Galveston and the investigation that followed.

The morning after Turnage's run-in with the Port of Galveston officers, the port's chief of police called Trevino. By the accounts of the Galveston officers, Turnage spoke in an increasingly loud voice and cooperated only reluctantly. He called the officers names. By his account, the Galveston officers were behaving unprofessionally as well. Even if that were true, it would not excuse his own bad behavior.

The constable's office then investigated the incident and told him about it. It concluded that Turnage had behaved unprofessionally and that his side job was unauthorized. It also disciplined Kessler for coordinating the unauthorized job.

   B.  *Due Process.*

Turnage was a volunteer reserve deputy for Harris County Precinct 6. He has no property interest that could have been taken away without due process because he was not an employee.[1] As a volunteer, he was not paid. He received

---

[1] *Board of Regents of State Colleges, et al., v. Roth*, 408 U.S. 564 (1972).

indirect benefits, including health insurance and payments for working police escorts. These benefits are enjoyed by all licensed peace officers in Texas. They are not exclusive to Harris County.

Even if he were an employee, his employment was at-will. He has not shown that he was dismissed for a constitutionally prohibited reason. As evidence, he says that he should have been internally disciplined instead of dismissed, as the precinct's guidelines recommend. Guidelines are just that – the suggestions of the organization that created them. They are not law.

### C. Texas Government Code Chapter 614.

Turnage says that Harris County and the Precinct 6 Officers did not give him the signed complaint that resulted in his dismissal.[2] The facts are otherwise. In less than twenty-four hours after the incident, Chief Pierce told Trevino about it and confirmed the conversation via email, attaching a copy of the incident report. DeAlejandro wrote to Turnage, telling him that he was under administrative investigation. Turnage then signed a notice of the investigation, which said that it had been triggered by an administrative complaint. DeAlejandro obtained affidavits from the port officers, and Turnage received access to them by May 22, 2013. He also gave Turnage an opportunity to submit his own statement and respond to the affidavits. Three months after the incident, Harris County dismissed Turnage.

### D. Conspiracy.

Turnage says that Harris County, DeAlejandro, Lozano, and Trevino conspired to dismiss him after he did not contribute to Trevino's campaign and to prevent him from receiving the documents he requested. Harris County is immune from intentional-tort suits, including conspiracy.[3] Also, Turnage has not shown that DeAlejandro, Lozano, and Trevino retaliated against him nor

---

[2] Tex. Government Code Ann. §§ 614.022, 614.023 (West 2011).

[3] Tex. Civ. Prac. & Rem. Code Ann. §101.057 (West 2009).

has he shown that they conspired to. At most, he has shown that the attorney general had to instruct the precinct to give him his file and that he thought that DeAlejandro, Lozano, and Trevino behaved differently after realizing that he did not donate to the campaign.

E. *Damages.*

Even if Harris County and the other constables were liable for Turnage's dismissal, he would have no damages. He volunteered for the precinct and for the extra job. His contracts were free, so he would have nothing to recover.

4. *The Wharves.*

A. *Assault, Conspiracy, and Interference with Contract.*

Turnage alleges that the Wharves and Galveston officers committed assault, tortious interference with contract, and conspiracy. All of these are intentional torts, from which Wharves is immune.

The officers invoked qualified immunity.[4] They reasonably believed that they needed to approach Turnage while he was on the port's property. They did their job in removing a suspicious and belligerent person.

Turnage claims that the officers tortiously interfered with two of his contracts – with Kessler and with Precinct 6. The extent of their interference was reporting Turnage's belligerent behavior on their property.

Turnage says that the port officers conspired against him because he was affiliated with Harris County. He relies upon anecdotal evidence from unattributed sources. In contrast, Chief Pierce said in his affidavit that the port often engages officers from non-Galveston police departments and that its own employees do extra work elsewhere.

---

[4] *See Harlow v. Fitzgerald*, 457 U.S. 800 (1982).

B.  *Fourth Amendment.*

Turnage says that the port officers violated his Fourth Amendment rights by unreasonably seizing him.[5] They did not attempt to restrain Turnage; they insisted that he leave the parking lot after he did not respond to ordinary requests and acted belligerently.

Also, the parking lot was port property. Ordinarily, the people waiting were customers in transport trucks. Turnage was not in a truck, not a customer, and did not show departmental identification after he told the port officers that he worked for Precinct 6 and was armed. The officers acted within their power to ask Turnage to leave.

C.  *Equal Protection.*

Turnage says that the port officers violated the Fourteenth Amendment equal protection clause, discriminating against him because he worked for Harris County.

He claims that the port officers forced him to leave because they were hostile toward an outside officer and did not target other vehicles. The officers acted rationally during their patrol. The person who hired Kessler and Turnage believed that the equipment sitting nearby needed guarding from vandals. The officers had a rational reason to talk to anyone sitting in a car in that parking lot watching the equipment. Even if Turnage were singled out among the people in the parking lot, his equal protection claim would fail. Choosing which car to approach when an officer has reason to approach every one is a discretionary decision, and the equal protection clause is not violated just because one person is selected rather than others.[6]

Turnage does not show that the officers had malicious intent. Herrera had no reason to believe that Turnage was an out-of-jurisdiction, reserve deputy constable when he approached his car. Turnage was in his personal vehicle

---

[5] *See Terry v. Ohio*, 392 U.S. 1 (1968).

[6] *See Engquist v. Oregon Dept. of Agr.*, 553 U.S. 591, 603-04 (2008).

wearing plain clothes. The officers had a legitimate reason to approach the cars in that parking lot.

5.   Conclusion.

Turnage imagines malicious motives for everybody. His problem, however, is that he has never denied that he did violate the rules of the precinct.

The City of Galveston and the Port of Galveston Police Department have already been dismissed. Harris County Precinct 6 will be dismissed.

Randall Turnage will take nothing from Harris County, Victor Trevino, Carlos DeAlejandro, Lillian Lozano, The Board of Trustees of the Wharves, Felipe Herrera, John Parker, and David Thomas.

Signed on April 16, 2018, at Houston, Texas.

*signature*
Lynn N. Hughes
United States District Judge